# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DARREN PARKER,                          Case No.

        Plaintiff,                      Hon.

v.

GENERAL MOTORS, LLC,

        Defendant.

---

Michael L. Pitt (P24429)
Bayan M. Jaber (P85451)
Attorneys for Plaintiff
117 W. Fourth St. Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
bjaber@pittlawpc.com

---

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, Darren Parker ("Parker"), by and through his attorneys, Pitt McGehee Palmer Bonanni & Rivers, P.C., files the following Complaint against Defendant, General Motors, LLC, ("GM" or "Company") and states as follows:

### INTRODUCTION

Plaintiff Darren Parker ("Parker"), age 52, brings this wrongful termination, retaliation, failure to transfer, and failure to accommodate claim against General

Motors, LLC ("GM" or "Company") under the federal Americans with Disabilities Act ("ADA") and Michigan's Persons with Disability Civil Rights Act ("PDCRA").

As a Tactical Operations Coordinator working with a team of approximately nine other Coordinators, Parker's main duties were to manage parts supplier production issues remotely from Oak Park, Michigan and would occasionally be assigned to visit out -of-state supplier production and warehouse facilities to monitor and resolve production issues.  Because of a degenerative joint disease of the knees and an inflammatory condition of his right foot and ankle, which were aggravated by travel to supplier facilities, Parker, per physician-ordered restrictions, was temporarily unable to travel to supplier locations.

Rather than accommodating Parker's disabling medical condition, GM placed Parker on a pretextual performance improvement plan after he complained that management was not honoring his restrictions during the time he was temporarily unable to travel.  Moreover, GM management blocked Parker's efforts to transfer to open positions which did not require travel, asserting he was ineligible for transfers because of the pretextually imposed performance improvement plan. Parker's travel restrictions were scheduled to expire on March 1, 2023.  GM nonetheless terminated Parker on February 1, 2023.

Parker brings this legal action to vindicate his civil rights seeking reinstatement to a suitable position at GM and fair and adequate compensation for his economic and non-economic losses.

## JURISDICTION, VENUE, AND PARTIES

1.      This wrongful discharge case is based on a failure to accommodate and retaliation for requesting an accommodation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 et seq., and the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37.1201, et seq.

2.      This Court has federal question jurisdiction over this case and controversy to enforce the provisions of the ADA. 28 U.S.C. §1331.[1]

3.      This Court also has supplemental jurisdiction under 28 U.S.C. §1367 to address the claims brought under the PDCRA because they are so related to the federal law claims that they form part of the same case and controversy.

4.      At all times relevant to this action, Parker was a resident of Oakland County, and is thus a resident of the Eastern District of Michigan.

5.      GM is a Delaware limited liability corporation with headquarters in Wayne County, in the state of Michigan. GM transacts business and performs

---

[1] Parker has exhausted all administrative remedies required by the ADA and the EEOC Detroit Field Office furnished a Notice of Right to Sue on March 13, 2024.

services in the Eastern District of Michigan. GM is a multinational automotive manufacturer.

6.    Venue in the Eastern District of Michigan is proper because Defendant is a resident of this district and because the events giving rise to this cause of action occurred in this district and division. 28 U.S.C. §1391(b)(1)(2).

## STATEMENT OF FACTS

7.    Parker is a highly-skilled veteran of the automotive industry, with 23 years of pre-production and quality assurance experience working for the Ford Motor Company.

8.    On April 4, 2022, Defendant hired Parker as a Tactical Operations Coordinator ("TOC").

9.    A TOC's main duties are to address parts supplier production issues and secondarily to serve as the Company representative authorizing and managing the movement of GM's tools, dies and molds by parts suppliers.

10.    Parker performed more than 90% of his work remotely from his home in Oak Park, Michigan.

11.    Less than 10% of his work time involved travel to parts supplier production sites.

12.    As a TOC, Parker's job duties required acting as a liaison between purchasing, engineering, warehousing/manufacturing, and logistics departments to

address a variety of parts supplier issues and coordinate effective and timely solutions.

13.     Essential functions of the TOC position include: 1.) Remotely attending "Emerging Issues" meetings to develop an action plan to resolve critical supply chain issues and generate reports accordingly; 2.) Remotely managing the movement of GM production equipment from one warehouse location to another; 3.) Ensuring effective communication with supplier warehouses experiencing supply chain issues.

14.     Parker was 1 of approximately 10 TOCs who also worked remotely from different locations.

15.     Parker and his fellow TOCs reported to Supervisor Tom Hoard ("Hoard"), who reported to Manager Dave Morton ("Morton").

16.      From April 2022 through July 2022, Parker performed his job duties satisfactorily and without issue.

### August 2022: Parker's Medical Conditions are Aggravated by Driving to and from a Kentucky Warehouse Twice in Two Weeks

17.     As part of fostering relationships with third-party suppliers, GM occasionally sends TOCs to supplier production and warehouse sites to observe operations and provide daily progress reports to GM management.

18.     While physical presence at the supplier warehouses is preferred, it is not required to ensure the resolution of supply chain issues.

19.     All TOCs are equally equipped and trained to perform this function, and any one of the TOCs may be called to cover a supplier production or warehouse site.

20.     The Company practice is to require TOCs to drive to supplier locations when onsite assignments are up to 500 miles from home, using a Company-issued vehicle. When an assignment exceeds 500 miles, GM flies the TOC to the assigned location.

21.     Assignments are often made at a moment's notice, and TOCs are expected to accept the assignment.

22.     On or around August 8, 2022, Hoard assigned Parker to drive to a supplier warehouse in Corbin, Kentucky, to help resolve delivery delays.

23.     At the time that Hoard issued the assignment, the only vehicle available was a compact car.

24.     Parker, who was 51 years old and is 6'3", made the 400+ mile drive in the compact car.

25.     At the conclusion of the nearly 7-hour drive, Parker's knees and legs were in a significant amount of pain.

26.     From August 9 to August 19, 2022, Parker remained on assignment at the supplier's warehouse, working the night shift from 7:00pm to 7:00am during which time Parker was required to walk around the facility to "observe" operations,

before making another 400+ mile, 7-hour drive back to Michigan in the same compact car.

27.   At the conclusion of the return drive, Parker's knees and legs were in an even greater deal of pain.

28.   On or around August 25, 2022, Hoard again assigned Parker to the supplier's Corbin, Kentucky warehouse to observe operations on the night shift.

29.   Again, Parker was forced to take the compact car for the nearly 15-hour total drive time and was again required to walk around the facility from 7:00pm to 7:00am.

30.   From August 25, 2022, through September 2, 2022, Parker remained on assignment at the supplier's warehouse.

31.   At the conclusion of this assignment, Parker's knee and leg pain significantly worsened.

**September 9: Parker Informs GM of Necessary Medical Restrictions**

32.   On September 8, 2022, Parker met with Dr. Ketan Tolia, MD, who checked Parker's legs and determined that the long drives in close succession and excessive walking had inflamed Parker's knee joints. Dr. Tolia issued Parker restrictions which included no excessive driving or prolonged walking or standing for 30 days.

33.     Parker's restrictions allowed him to return to work and perform all desk/remote work duties but precluded him from onsite assignments for 30 days.

34.     On September 9, 2022, Parker provided a copy of his restrictions to Morton and Human Resources ("HR") Representative Amanda Gladson ("Gladson").

**September 11: GM Forces Parker to Take an Unnecessary Medical Leave of Absence**

35.     On or about September 11, 2022, Morton and Gladson called Parker on the phone during which time Morton forced Parker to take a six-week medical leave of absence and instructed him to file a short-term disability claim on September 12, 2022.

36.     Despite the fact that Parker was willing and able to perform all remote-work functions of the TOC position, Morton refused to provide him with this accommodation.

37.     According to Morton, if Parker could not travel to support suppliers on-site, he would be "useless" as a TOC.

**September 29:  Parker is Diagnosed as Having a Degenerative Joint Disease of the Knees**

38.     On September 29, 2022, Dr. Tolia issued a preliminary diagnosis of degenerative joint disease in both of Parker's knees.

39.   Degenerative joint disease, also known as osteoarthritis, is a chronic illness that causes the irreversible progressive breakdown of protective cartilage around the joints that worsens over time and leads to deterioration of the connective tissues that hold bone joints together and attach muscle to bone.

40.   Degenerative joint disease is caused by repeated stress on the joint(s) and immediate symptoms include chronic pain, stiffness, and swelling, among other long-term symptoms.

41.   Dr. Tolia further prescribed Parker physical therapy sessions twice weekly for eight weeks; Beginning October 14, 2022, through December 8, 2022.

42.   Parker emailed a copy of this prescription and prospective therapy schedule to HR Representative Gladson, Hoard, and Morton.

43.   On October 14, 2022, HR Representative Megan Cardenas[2] ("Cardenas") reviewed Parker's file, determined that he never should have been placed on leave, and ordered Parker back to work to perform all remote-work duties of the TOC position.

44.   As a result, Parker's short-term disability claim was retroactively denied, and he was forced to pay back the $3,210.23 paid to him during the involuntary leave.

---

[2] Cardenas replaced Gladson on Parker's case.

**November 18: Parker's Restrictions are Extended**

45.    Dr. Tolia, at the recommendation of Parker's physical therapy team, referred him to an orthopedic knee surgeon, Dr. Michael W. Laker, MD, to assess the stability of his knees.

46.    On November 18, 2022, Dr. Laker diagnosed Parker with chronic pain of bilateral knee joints, as well as synovitis (swelling and inflammation in the synovial membrane of his joints) associated with the osteoarthritis. Dr. Laker confirmed that if Parker attempted to resume driving and site visits, he would reaggravate and worsen his condition. Dr. Laker further referred Parker to orthopedic foot and ankle surgeon, Dr. Robert G. Dekker, II, MD, ("Dr. Dekker") to specifically assess aggravation of an inflammatory process of Parker's right foot and ankle.

47.    Dr. Laker extended Parker's travel restrictions for six additional weeks.

48.    After the appointment, Parker emailed a copy of his restrictions to HR Representative Cardenas, Hoard, and Morton. Parker additionally called Hoard to personally inform him of the diagnosis and restriction extension.

**November 22: Hoard Places Parker on a Performance Improvement Plan**

49.    On November 22, 2022, Hoard, Cardenas, and Morton informed Parker during a Teams Meeting that he was being placed on a Performance Improvement Plan ("PIP") which included weekly Monday meetings to assess Parker's progress.

50.    Parker protested the PIP and stated that it was not necessary because he was meeting all of his required metrics, completing all tasks, and had not previously been informed of any performance issues.

51.    Shortly after the meeting, Parker emailed Cardenas expressing concerns that the PIP was retaliation for needing continued restrictions due to his serious medical condition and were pretext to get him terminated.

**December 12:  Parker Seeks a Transfer and PIP Meetings Continue**

52.    Following the PIP meeting, Parker began to seek alternative employment within GM with duties more aligned with his restrictions that would distance him from Hoard and Morton.

53.    On December 6, 2022, Parker met with orthopedic foot and ankle surgeon, Dr. Dekker, who adjusted Parker's restrictions and prescribed Parker a medical boot to control and eliminate the inflammatory process found in his right foot.

54.    On December 12, 2022, Parker interviewed for a Pre-Production Specifications Analyst position. While the interview was a great success, Hoard and Morton informed Parker that he was not eligible for transfer to a new position because of his PIP status, precluding him from ultimately obtaining the transfer.

55.    On December 14, 2022, Cardenas informed Parker that HR initiated an investigation into Parker's retaliation claims against Hoard and Morton.

56.     Meanwhile, Hoard, Morton, and Cardenas met with Parker on a weekly basis pursuant to the PIP, where they provided unworkable "feedback" and nitpicked Parker's work.

57.     On December 20, 2022, Parker met with Dr. Dekker again to review the results of Parker's recent MRI test. Dr. Dekker instructed Parker to continue wearing the medical boot, stay off his right foot, and to only perform remote desk work until progress could be assessed at a follow up appointment on January 17, 2023.

58.     Parker emailed these updates to Cardenas, Morton and Hoard.

59.     On or around January 16, 2023, Cardenas summarily concluded the investigation, finding no evidence of retaliation.

**January 17:  Parker's Medical Restrictions are Extended to March 1**

60.      On January 17, 2023, Dr. Dekker issued Parker a final set of restrictions which included six more weeks of limited walking and no impact on Parker's right foot for six weeks as he began to wean off the medical boot. Parker emailed these restrictions to Cardenas, Hoard, and Morton.

61.     On or about January 18, 2023, despite knowing of Parker's restrictions, Hoard called Parker and assigned him a site visit in Ohio. Parker stated that per his restrictions, he could not perform any onsite assignments. Hoard hung up the phone on Parker.

62.    On January 31, 2023, Hoard called Parker at 7:30pm and asked him to appear for an in-person performance review at the GM Global Technical Center the following day.

### February 1:  Parker is Terminated

63.    On February 1, 2023, Parker met with Morton at the Tech Center, with Hoard and Cardenas appearing remotely. Morton started the meeting by informing Parker that his employment was terminated, citing "Red" ratings issued during weekly PIP meetings, all of which had been concurrently disputed by Parker when issued. Parker pushed back, asking whether the termination was related to his use of a medical boot, pleading that his last set of restrictions would expire on March 1. Cardenas responded only to instruct him to hand over his company issued cell phone, credit card, computer, and parking pass.

### COUNT I
#### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
#### Disability Discrimination, Failure to Accommodate, Retaliation
#### Disability Discrimination – Termination

64.    The ADA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer perceives the individual as possessing a disability.

65.    At all times relevant to this action, Parker was an employee and GM was an employer within the meaning of the ADA.

66.     At all times relevant to this action, Parker was a qualified individual with a disability pursuant to 42 U.S.C. §12111(8) who, with or without an accommodation, could perform the essential functions of his position.

67.     Parker was an individual with a disability within the meaning of 42 U.S.C. §12102 (degenerative joint disease of knees and inflammatory process of right foot), because he had a physical impairment that substantially limited one or more of his major life activities (traveling and walking), who with or without an accommodation, could perform the essential functions of his job with GM.

68.     Notwithstanding said duties as set forth above, GM discriminated against Plaintiff because of his disability when GM terminated Parker's employment on February 1, 2023.

69.     Further, GM's stated reason for Parker's termination (poor performance) is pretext for disability discrimination in violation of the ADA.

70.     Placing Parker on an unnecessary medical leave of absence and depriving him of full pay and benefits by doing so and then securing reimbursement for the short term disability benefits paid to him while on the leave that was neither requested nor necessary constitutes disability discrimination.

**Failure to Accommodate**

71.     The ADA further requires employers to engage in good faith in an interactive process to ascertain reasonable accommodations for employees.

72.     At all times relevant hereto, Defendant had a duty pursuant to the ADA to accommodate Parker for the purposes of employment unless the accommodation would impose an undue hardship.

73.     The Company's duty to accommodate included but was not limited to allowing Plaintiff to perform remote/desk work while recovering from his serious medical condition, reassignment to a vacant position, and job restructuring. 42 U.S.C. § 12111(9).

74.     Further, GM interfered with Parker's ability to obtain alternative gainful employment within the Company when it precluded Parker from being reassigned to a vacant position, citing the pretextual PIP as the reason Parker was ineligible for the reassignment.

75.     Parker's request that he temporarily not be assigned travel duties until March 1, 2023, so that he could recover from the disabling medical conditions was a proper request for reasonable accommodation. *Cehrs v NE Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir. 1998)

76.     At all times relevant hereto, GM could have accommodated Parker's disability with the aforementioned reasonable accommodations without suffering an undue hardship.

77.     GM failed to engage in the interactive process whereby it could have easily assigned one of the other ten TOCs to cover Parker on site visits and allowed

Parker to continue performing his remote work consisting of more than 90% of his job duties or it could have reassigned him a vacant position (Pre-Production Specifications Analyst Position) or it could have simply continued his restrictions until March 1, 2023.

78.     Instead, GM violated Parker's rights under the ADA when GM failed to reassign him to a vacant position, assigned other TOC's to temporarily cover the travel duties or simply continued Parker's restrictions to March 1, 2023.

### Retaliation – Placing Parker on a PIP and Terminating Him

79.     At all times relevant hereto, GM had a further duty not to retaliate against Parker for requesting accommodation or protesting a violation of his ADA rights.

80.     Notwithstanding said duties as set forth above, GM retaliated against Parker by placing him on a PIP and further retaliating against him by terminating him when he protested to HR a violation of his ADA rights.

81.     As a result of a violation of Parker's rights under the ADA, Parker is entitled to compensation for his economic losses and for his non-economic losses including emotional distress, humiliation, mental anguish, loss of reputation and outrage.

### COUNT II

**VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT**
**Disability Discrimination, Failure to Accommodate, Retaliation**

82.    Parker incorporates by reference the former paragraphs as though fully stated herein.

83.    The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer perceives the individual as possessing a disability.

84.    At all times relevant to this action, Parker was an employee and GM was an employer within the meaning of the PDCRA.

85.    At all times relevant to this action, Parker was a qualified individual with a disability who, with or without accommodation, could perform the essential functions of his position.

86.    Parker was an individual with a disability within the meaning of the PDCRA, because he had a physical impairment (degenerative joint disease of knees and inflammatory process of right foot) that substantially limited one or more of his major life activities (traveling and walking), who with or without an accommodation, could perform the essential functions of his job with GM.

87.    Notwithstanding said duties as set forth above, GM discriminated against Plaintiff because of his disability when GM terminated Parker's employment on February 1, 2023.

88.    Further, GM's stated reason for Parker's termination (poor performance) is pretext for disability discrimination in violation of the PDCRA.

## Failure to Accommodate

89.    The PDCRA further requires employers to engage in good faith in an interactive process to ascertain reasonable accommodations for employees.

90.    At all times relevant hereto, Defendant had a duty pursuant to the PDCRA to accommodate Parker for the purposes of employment unless the accommodation would impose an undue hardship.

91.    The Company's duty to accommodate included but was not limited to allowing Plaintiff to perform remote/desk work while recovering from his serious medical condition, reassignment to a vacant position, and job restructuring.

92.    Further, GM interfered with Parker's ability to obtain alternative gainful employment within the Company when it precluded Parker from being reassigned to a vacant position, citing the pretextual PIP as the reason Parker was ineligible for the reassignment.

93.    Parker's request that he temporarily not be assigned travel duties until March 1, 2023, so that he could recover from the disabling medical conditions was a proper request for reasonable accommodation.

94.    At all times relevant hereto, the Company could have accommodated Parker's disability with the aforementioned reasonable accommodations without suffering an undue hardship.

95.    GM could have easily assigned one of the other ten TOCs to cover Parker on site visits and allowed Parker to continue performing his remote work consisting of more than 90% of his job duties or it could have reassigned him a vacant position (Pre-Production Specifications Analyst Position) or it could have simply continued his restrictions until March 1, 2023.

96.    Instead, GM violated Parker's rights under the PDCRA when GM failed to reassign him to a vacant position, assigned other TOC's to temporarily cover the travel duties or simply continued Parker's restrictions to March 1, 2023.

**Retaliation – Placing Parker on a PIP and Terminating Him**

97.    At all times relevant hereto, GM had a further duty not to retaliate against Parker for requesting accommodation or protesting a violation of his PDCRA rights.

98.    Notwithstanding said duties as set forth above, GM retaliated against Parker by placing him on a PIP and further retaliating against him by terminating him when he protested to HR a violation of his PDCRA rights.

99.    As a result of a violation of Parker's rights under the PDCRA, Parker is entitled to compensation for his economic losses and for his non-economic losses

including emotional distress, humiliation, mental anguish, loss of reputation and outrage.

<u>**REQUEST FOR RELIEF**</u>

100.    Accordingly, Parker requests the following relief:

a.      An Order of this Court reinstating Parker to his former position or a comparable position.

b.      An Order of this Court awarding Parker compensation in an amount to which he is found to be entitled.

c.      An Order of the Court awarding Parker punitive damages under the ADA for GM's willful violation of Parker's ADA civil rights.

d.      An Order awarding Plaintiff interest, costs, attorney fees and litigation expenses as provided for by the PDCRA and ADA; and

e.      An Order awarding Plaintiff such other equitable relief as this Court deems just and equitable.

Respectfully submitted,
**PITT MCGEHEE PALMER BONANNI & RIVERS**

By: /s/Bayan M. Jaber
Bayan M. Jaber (P85451)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI 48067
248.398.9800
bjaber@pittlawpc.com
Dated: June 6, 2024          mpitt@pittlawpc.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DARREN PARKER,                          Case No.

              Plaintiff,                Hon.

v.

GENERAL MOTORS, LLC,

              Defendant.

---

Michael L. Pitt (P24429)
Bayan M. Jaber (P85451)
Attorneys for Plaintiff
117 W. Fourth St. Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
bjaber@pittlawpc.com

---

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues raised in this action.

Respectfully submitted,
**PITT MCGEHEE PALMER BONANNI & RIVERS**

By: /s/Bayan M. Jaber
Bayan M. Jaber (P85451)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI 48067
248.398.9800
bjaber@pittlawpc.com
mpitt@pittlawpc.com

Dated: June 6, 2024